UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 4:19 CR 00416 RWS |
| v. | ) | |
| | ) | |
| WILLIAM MILLER, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S OMNIBUS SENTENCING
MEMORANDUM AND RESPONSE TO
DEFENDANT'S SENTENCING MEMORANDUM**

Comes now the United States of America, by and through Reginald Harris, Attorney for the United States, and Hal Goldsmith, Assistant United States Attorney for the Eastern District of Missouri, and for its Omnibus Sentencing Memorandum and Response to Defendant's Sentencing Memorandum, states to this Honorable Court as follows:

1. From December, 2017, when former St. Louis County Executive Stenger hired this defendant as his Chief of Staff, defendant Miller was Stenger's right hand man, not only in running St. Louis County government, but in defendant Stenger's extensive pay to play scheme. True, this defendant took his marching orders from Stenger, but then, on his own, directed subordinate St. Louis County employees in various aspects of the illegal scheme, including directing subordinates to favor Stenger's political donors in the awarding of government contracts. With full knowledge that what they were doing was wrong, this defendant never hesitated to exert his authority as Chief of Staff to direct subordinate employees to take official action in aid of Stenger's pay to play scheme. This defendant's criminal conduct was

1

reprehensible, particularly considering that he was a licensed attorney; that he had previously served as legal counsel to the Governor of Missouri and as an Administrative Law Judge; and that he was earning a salary of $130,000. He owed his honest services to the residents of St. Louis County who paid him that salary, and he abused their trust through his significant criminal conduct here. Application of the United States Sentencing Guidelines here advises a sentence of 15 to 21 months' imprisonment. A sentence within that advisory range would be fair and just under the facts and circumstances here, and would acknowledge the extent of defendant's criminal conduct and the substantial harm his conduct caused to the public.

2. Title 18, United States Code, Section 3553(a) sets out the factors this Court should consider in fashioning an appropriate sentence. The first such factor to be considered is the nature of the offense, 18 U.S.C. 3553(a)(1). As this Court is well aware, the underlying pay to play scheme was extensive, and involved any number of grants and contracts being awarded to political donors in exchange for their contributions and continued financial support. The County Executive didn't, and couldn't, carry out his illegal scheme without the aid and assistance of this defendant William Miller.[1] Specifically, Stenger hired defendant William Miller at the end of 2017 because he believed that he could trust Miller to carry out his pay to play scheme, and could rely upon Miller during the upcoming 2018 election year where Stenger faced a strong primary opponent in businessman Mark Mantovani. Stenger needed to raise substantial campaign funds in that effort, and he needed defendant Miller as Chief of Staff to ensure that those political donors received the benefit of government contracts by directing subordinate County employees to give contracts and grants to the political donors and their

---

[1] Whoever aids or abets the commission of an offense is punishable as a principal. Title 18, United States Code, Section 2.

companies. It is important to note that Miller was not hired by Stenger to fill an open vacancy, but replaced Stenger's incumbent Chief of Staff, Jeff Wagener, who then became subordinate to Miller and answered to him. Wagener had not been successful on a number of occasions in persuading subordinate employees to award County contracts to Stenger's political donors, for example in Stenger's efforts to get businessman and political donor John Rallo County insurance contracts in 2015 and 2016, and Stenger brought in Miller as a replacement without any advance notice to Wagener. As one executive at the St. Louis Economic Development Partnership put it when interviewed by the FBI, "Wagener would never threaten people the way Miller currently does."

      3. Defendant Miller fully accepted his role as "Number Two," and did not disappoint Stenger. For example, when discussing the need to award a three (3) year state lobbying contract to a longtime significant Stenger political donor, it was defendant Miller, not Stenger, who summed it up:

> November 19, 2018:
>
> Miller: "**It's about the art of staying in power**."

Those seven (7) words clearly reflect that this defendant, William Miller, was not simply following orders, but was undertaking to carry out Stenger's pay to play scheme for one purpose, so that Stenger's administration, including the defendant as Chief of Staff, could retain their political power in leading and governing the largest and most populous county in the State of Missouri. Regarding that state lobbying contract, it was this defendant, William Miller, who directed two subordinates, the recently demoted Jeff Wagener and Senior Policy Advisor Tom Curran, as to how best to approach the CEO of the St. Louis Economic Development Agency, Sheila Sweeney, in order to persuade her to recommend that the contract go to Stenger's political donor.

November 20, 2018:

Wagener: "Are you going to make clear what Steve wants?"

Miller: "I don't know Jeff, I think it's risky….**If it was just me and her, in some dark room somewhere, I might make it a little bit more forceful**. But with all of us there, I think…."

Wagener: "Do you think she knows what Steve wants?"

Miller: "**I've already told her, Jeff, I sent the message**."

The only hesitation Miller showed was due to the fact that others would be present during the meeting with Sweeney, including Wagener and Curran, which caused defendant Miller concern as to how forcefully he could direct Sweeney to award the contract as desired. During the actual Starbucks meeting with Sweeney, it was defendant Miller who took the lead in "sending the message."

November 20, 2018:

Miller: "So, how's [Company One] been for you guys?"

Sweeney: "…I'd say he's been good. I just don't know, weighing them both [both companies that had bid on the contract]. Your input, knowing what Steve likes, is important.

Miller: "**Well, Steve's going to say [Company One]**."

And then, following the meeting, in discussions between defendant Miller and his two subordinates, Wagener and Curran:

November 20, 2018:

Wagener: "I think she's going to let the process go forward."

Miller: "**I don't have a problem with that, as long as the outcome is the right outcome, guys**. She did ask about Steve's input, what he wants. **I already told her**, she already knew that."

Wagener: "I think she's going to let the process go forward, we

can't tell her what to do."

Miller: I don't know, Jeff, I think, she said she'd take into consideration what Steve wanted, she did make that concession. But to say, well, what does Steve want, **she knows what f---ing Steve wants, I told her**, Jeff....**I will say this, there's no way she did not get the message. She can never say I wasn't sure what he wanted. Right?**"

Wagener: "No, I think she got that message."

Clearly, this defendant William Miller sent "the message." Later, in reporting the Starbucks meeting to Stenger:

November 20, 2018:

Miller: "I think she will....I think she's gonna go with [Company One]. I think she is. **And if she doesn't, we know where we stand**."

As Miller implied, if Sweeney didn't play ball and award the contract to Company One, then they *as a team* would know where they stood with Sweeney, and they could then move to have her terminated from the Economic Development Partnership, an option which had been previously discussed at length between Miller and Stenger for several months.

4. As, for example, in the situation relative to the dispute between Stenger and the County Council concerning control of the St. Louis County Port Authority:

September 18, 2018:

Stenger: "Find out who over there [Port Authority] is aggressive enough to move this f---ing shit forward, and to fight Sam [Councilman Sam Page], and that person ought to be the head over there. In the meantime, we ought to work a real careful plan on getting Sheila gone and let her do something off into the sunset. Maybe there's a way to work it so she's gone, and she's happy gone...But she's happy gone and not f---ing with us."

Miller: "**I agree with that Steve, ultimately she's got to leave because she's not on the team anymore, she's not with us, and**

5

**this isn't helpful**."

Yes, as defendant Miller noted in this conversation, by September, 2018 Sweeney had seen the light and was not acceding to all of their directives, and they were worried that if she remained in her position as head of the Economic Development Partnership and the Port Authority their ability to utilize the Port Authority to issue contracts as part of the pay to play scheme would be hindered. As this Court has noted so frequently, words have meaning, and there is no question that defendant Miller's words here reflect that he was not simply following Stenger's orders, but he was all on board "Team Stenger" relative to the illegal scheme and conduct, even in the face of a significant defection by Sheila Sweeney.

5. There has been much made of the fact that Stenger carried out his pay to play scheme in part through bullying, threatening and intimidating county employees, and that sometimes those threats included termination. This defendant has even pointed that out in his Sentencing Memorandum (page 5) as an excuse for his criminal conduct here. Defendant states: "The always present understanding that termination from employment could result from a refusal to comply with Stenger's directions, was particularly effective on this Defendant…." Defendant's argument, if you follow it to its logical conclusion, is that defendant was afraid of being fired from a job which required him to break the law and, therefore, he continued to assist his boss in breaking the law in order to keep that job. Not to make light of what is a serious issue, but defendant's argument here is like a child explaining to his parents that he didn't really want to steal and eat another child's lunch, but the class bully threatened to put his head in the toilet if he didn't. Which, for a child, *might* carry some weight. But for this defendant, a licensed attorney and former judge to make such a suggestion is an insult to the intelligence of this Court and to the victims in this case and should not be an acceptable explanation, or justification for, or excuse to the serious

criminal conduct committed by defendant here.

6. For what is clear in this case is that this defendant, William Miller, as the number two authority in St. Louis County government, was right there along with Stenger in making threats and intimidating subordinates, and took the lead on his own initiative on occasion. As just one example, during fall 2018, the County Council was in a pitched fight with the St. Louis County Port Authority, a purportedly independent entity which, in fact, was controlled by Stenger through Sheila Sweeney. In-house legal counsel for the Partnership was working on a legal opinion regarding the makeup of the Port Authority's Board, and the issue of whether the County Council could replace Board members who were allied with Stenger, a position which Stenger adamantly opposed. In a conversation with Stenger, defendant Miller reported that he had threatened that Partnership attorney with his job:

> September 18, 2018:
>
> Miller: "I think we're going to have an opinion tomorrow…I tried to convince [ ] of exactly what you want to do, Steve. [ ] is a nobody, he's a first year, he's completely clueless. **But at some point he has to know…that his f---ing job is on the line, and that's exactly what I told him. I told him that at lunch**."

Significantly, not only did defendant Miller threaten to fire the lawyer, he then took full credit for his independent actions when he reported back to Stenger. This Court should note that, as Chief of Staff for St. Louis County, defendant Miller should not have had any role in the conduct and operations of the independent Partnership and Port Authority, yet he had no hesitation in threatening and directing the Partnership's legal staff when it was in his and Stenger's interest. Again, as an attorney, defendant well knew the legal boundaries he was crossing, but showed no concern in that regard. Shortly thereafter, in an effort to exert even more control and influence over the Economic Development Partnership, Stenger appointed defendant Miller to the

Partnership Board. As defendant Miller advised Stenger concerning the Partnership Board:

> September 20, 2018:
>
> Miller: "**We need our friends on there [Partnership Board]…. People who will do what we say**."

7. Defendant suggests to this Court that his conduct is similar to Sheila Sweeney's in that they both succumbed to Stenger's intimidation in carrying out his scheme. Nothing could be further from the truth. Stenger put Sweeney in charge of the St. Louis Economic Development Partnership Authority and the County Port Authority because he believed correctly that he could bully, threaten, and intimidate her to do what he wanted. Stenger put Miller in charge of St. Louis County government because he believed correctly that he would be a team player and do his bidding without having to be told.

8. Further, defendant's attempted use of the Nuremberg Defense here is, under the facts and circumstances, inexcusable. Defendant says he was just following orders, or as defendant stated in his Sentencing Memorandum (page 4): "Defendant's role in the offense consisted of his doing what his boss told him to do." Such a defense was soundly rejected 70 years ago by the Court during the Nuremberg trials following World War II. We can also look to the Watergate scandal of the 1970s, where President Nixon's own Chief of Staff, H. R. Haldeman, attempted such a defense, but was convicted and sent to federal prison for his criminal conduct. Significantly, Nixon's Deputy Chief of Staff Alexander Butterfield refused to follow orders, admitted the existence of the damaging White House tapes, and avoided prosecution. Here, of course, defendant Miller could have resigned his position at any time rather than continue to aid and assist in the County Executive's criminal scheme, or he could have simply said "no," as Sheila Sweeney did.[2]

---

[2] Others who refused to carry out Stenger's scheme include, but are not limited to, former St. Louis County Director

He could have actually carried out his legal and ethical obligations by blowing the whistle on Stenger's pay to play scheme, and alerting the authorities, but he did not. Now, defendant puts forth the, "I didn't want to do it, but he made me" defense. That is an outrageous claim for this defendant to make under the facts and circumstances here and such a defense should be rejected outright by this Court.

9. Defendant's relevant conduct for calculating the United States Sentencing Guidelines here specifically relates to defendant's criminal actions in directing Sheila Sweeney to recommend that the St. Louis Economic Development Partnership Board issue a three year state lobbying contract to a significant Stenger political donor's company, Company One. As discussed above, once defendant Miller understood that Stenger favored Company One over the other competitive bidder, Miller took steps to deliver "the message" to Sweeney, directing two of his subordinates, Wagener and Curran, in that mission. What should not be lost here is that, not only did Miller abuse his position of trust to the citizens of St. Louis County in his actions, but, once he was appointed as a Board Member of the St. Louis Economic Development Partnership during October, 2018, he violated his fiduciary duties to that Organization. Not only were the citizens and the Partnership victimized by defendant Miller's actions, but the other lobbying firm which had submitted a competitive bid was victimized by not having a level playing field in the bidding process. Unbeknownst to that other firm, as a direct result of this defendant's actions it never had a chance at winning that contract. This was not a victimless crime by any standard or measure.

Further, defendant Miller, not Steve Stenger, directly communicated with the owner of Company One regarding the lobbying contract, keeping him apprised of the status of the bid via

---

of Administration Pam Reitz and Director of Operations Mike Chapman.

text messaging.

> November 28, 2018:
>
> Company One Owner: "When is the next partnership board meeting?"
>
> Miller: "Dec. 12 – 4 pm."
>
> Company One Owner: "Ty."
>
> December 11, 2018:
>
> Company One Owner: "Any of this council action affect what the Partnership may do with lobbying contract??  I believe u said the Board for the Partnership meets this week."
>
> Miller: "I don't think so.  We meet tomorrow."
>
> Company One Owner: "Ok thanks sorry to bug u!!  Please lemme know what they decide if u don't mind.  I need to adjust my business plan if things went south.  Thanks Bill for everything."
>
> Miller: "I'll keep you posted."
>
> Company One Owner: "Ty."
>
> December 12, 2018:
>
> Miller: "We just approved you."
>
> Company One Owner: "Ty sir."

This is simply one more example where defendant Miller was significantly involved in the pay to play scheme and took actions to make sure the scheme succeeded.

10. In considering the nature and circumstances of the offense, and the history and characteristics of the defendant, this Court should consider that defendant was involved in other aspects of aiding and abetting the criminal conduct of Steve Stenger while this defendant served as his Chief of Staff.  For example, when Stenger wanted one of his political donors to be the

project developer on a redevelopment project which was opposed by a local elected official [hereinafter referred to as "Jane Doe"], defendant became aware of and supported a plot to buy off Jane Doe so she would change her vote and support the donor's project. Defendant discussed the scheme on September 17, 2018:

> Miller: "He's gonna have [Project Developer] hire him, hire her [Jane Doe's] Dad."
>
> Wagener: "Hire her Dad…in what capacity? As an attorney?"
>
> Miller: "Uh, just…who knows. He'll be on the payroll."
>
> Miller: "**And I told Steve [Stenger], do you want me to call [project developer] to take care of this?** This was weeks ago. No. No. Ok. Then f---ing don't have [project developer] call us. You know? I mean, it's like…f---."

And again on October 1, 2018:

> Wagener: "Do you think the [redevelopment project] will go away?"
>
> Miller: "Well, they [project developer] have shown a willingness to work with…Jane Doe. If you're Jane Doe, you're not in a bad spot. Because our argument is this is the only thing going to work, and her response is, OK, what do I get for it?... **She's better off with this and getting her greedy f---ing sticky fingers in it all**."
>
> Miller: "Apparently they're [project developer] going to give her some shops or something, who knows…and they're going to hire her Dad. **What do we care, we're not doing it….Steve can show a win if it goes through. Do I think it's right? Of course it's not right. What do we f---ing care?**" And if it gets Jane Doe a little closer to us, who cares? Look, until the end of the year, **we need friends**."

11. Another example of defendant Miller's history and characteristics can be seen in a discussion with Steve Stenger and Jeff Wagener where the three were discussing the issue of racial equity in St. Louis County:

11

October 2, 2018:

Miller: "When you have [Yaphett] El-Amin [Director of MOKAN] and [Adolphus] Pruitt [Director of City NAACP] and all those f---ers arguing about inclusion and equity and shit, I'm like, f---, forget it. Of course, I have sued El Amin's father, Eddie Hasan, for failing to pay his printing bill…. He wanted to f--- with me one night when we were trying to work out payment of this bill…so he made me go down to their place, it's the Argus, which is in the f---ing hood…. I saw first-hand what MOKAN was…I just f---ing can't stand those people, I just think it's a racket."

As seen in this conversation with Stenger, Miller let his personal animosity improperly influence his position as Chief of Staff for St. Louis County and his decision making.

12. There is no question but that during 2018 Stenger was in a political battle on many fronts with the County Council, and in particular with then Council Member Sam Page who was making public allegations of pay to play against Stenger's administration. Defendant Miller actively participated in advising Stenger on these issues in order to remain in Stenger's good graces and to maintain his position in Stenger's administration. For example, in a post-election discussion with Jeff Wagener and St. Louis County Planning Director Glen Powers:

November 15, 2018:

Miller: "We're trying to make Sam [Page] irrelevant, next. That might also be a fantasy. If Rochelle [Council Member Rochelle Walton Gray] tells him, well you're going to be the Chair again, just like Hazel (Council Member Hazel Irby] did, and I know Hazel had a reason, you know she was sick. But if Rochelle is like, it's really hard to do Roberts Rules of Order, I don't know when to say what, even though it's f---ing written there, then Sam could very well be the guy. But we don't want him to be the guy if we can isolate him. And right now our play is to build bridges with [The Incoming Council Members]. And then figure out who replaces Hazel, and try to have some influence that way."

Thus, it is clear that, even though defendant Miller was well aware of Stenger's criminal scheme during this period, he had no concerns about the illegal acts he was aiding and abetting and, in fact,

was working hard to strengthen Stenger's position as County Executive.

13. In reviewing defendant's history and characteristics, this Court should also consider that on March 20, 2019, when Special Agents of the FBI approached defendant to interview him about his knowledge of the pay to play scheme, defendant made false statements to the Agents. For example, defendant falsely denied any knowledge or involvement in the above-referenced plan to bribe Jane Doe in order to win her approval and support of the redevelopment project to be developed by Stenger's political donor. During the interview, defendant Miller admitted to the Agents that Steve Stenger had offered Miller the Chief of Staff position in the newly created uni-government should the Better Together plan for consolidating the City and the County come to pass.[3]

14. Defendant argues in his Sentencing Memorandum (page 2) that his "diagnosis of a major disorder" is a basis for this Court to vary downward from the sentencing guidelines range here. The government notes that prior to March 2019, when defendant says he first learned of the government's investigation, this defendant suffered from no such disorder. It was only recently that defendant was diagnosed. The government suggests that many white collar defendants who appear before this Court often claim to suffer from this very same disorder once they learn they are under federal investigation and face the possibility of imprisonment. Defendant's condition is not an extraordinary health condition such as to warrant a variance or any leniency, is easily treated with medications while within the Bureau of Prisons, and as the

---

[3] Defendant participated in Stenger's illegal scheme with the full understanding and hope that the Better Together Plan would pass in 2020, Stenger would be anointed Mayor of the unified government, and Miller would have his position in the unified government's administration. As defendant Miller stated on December 6, 2018 in a discussion with Stenger and Wagener: "Every advice I give you is to make sure you're OK, because the election is over, but 2020's coming."

Presentence Investigation Report notes, "the defendant may benefit from participating in…health treatment during any period of incarceration…."

15. Defendant has an advisory guideline sentence range under the United States Sentencing Commission Guidelines of 15-21 months in prison. The government submits that there is no basis whatsoever in the law or the underlying facts and circumstances here that would justify a downward variance to a sentence less than the advisory guideline sentence. It is the government's position that justice and fairness require a sentence of imprisonment in this case. As a direct result of defendant's criminal conduct, the adverse impact upon St. Louis County and its residents who rely upon their elected officials to perform their jobs honorably and with integrity has been substantial. This is *not* a victimless crime. Our public officials should be held accountable for their criminal conduct by appropriate prison sentences; the victim residents deserve it, and fairness and justice require it.

16. In fashioning an appropriate sentence here, this Court needs to have a full and clear understanding of the adverse impact defendant's criminal conduct has had on the residents of St. Louis County, St. Louis County Government, and the St. Louis Economic Development Partnership and its affiliated organizations, the St. Louis County Port Authority and the Land Clearance for Redevelopment Authority of St. Louis County. Attached as Government Exhibits 1 - 4 to this Sentencing Memorandum are four (4) letters which articulate the truly substantial and harmful impact that the criminal pay to play scheme which defendant aided and abetted had upon these individuals and entities. These letters were originally submitted to Judge Perry in the related cases but are equally applicable here.

17. Only a guideline prison sentence will adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment for defendant's criminal

offenses as is required by 18 U.S.C. 3553(a)(2)(A).  Defendant was a high ranking public official, and the public should have been able to count on him and trust him to provide them with his honest services.  Instead this defendant broke that trust here and should be justly punished.

WHEREFORE, the United States of America prays that this Honorable Court sentence defendant to an appropriate term of imprisonment within the advisory guideline range, without a downward variance, and for such other relief as this Court deems appropriate and just under the circumstances.

Respectfully submitted,

REGINALD HARRIS
Attorney for the United States


 */s/Hal Goldsmith*
HAL GOLDSMITH #32984
Assistant United States Attorney
111 South 10th Street, Room 20.331
St. Louis, Missouri  63102
(314) 539-2200


**CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2019, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the defendant's counsel of record.

 */s/ Hal Goldsmith*
HAL GOLDSMITH
Assistant United States Attorney