# Exhibit 1

# ST. LOUIS COUNTY





July 24, 2019

Honorable Catherine D. Perry
United States District Court for the Eastern District of Missouri
111 South 10th Street
St. Louis, Missouri 63102

Re: *United States v. Steven V. Stenger*, Case No. 4:19CR312 CDP/NCC

Dear Judge Perry:

As elected representatives of St. Louis County government, we are jointly writing to summarize the defendant's negative impact on our County and its residents. This letter reflects our collective experience, as well as the experience of several County employees, appointees, residents, and other impacted individuals, facts we uncovered when we asked them to describe their experiences with the defendant. We hope this will assist you in deciding the fair and just sentence to impose in this case.

The defendant's behavior had a devastating impact on St. Louis County. The defendant's criminal conduct speaks for itself, but the impact of his behavior goes far beyond the facts described in the indictment. For five years, the defendant behaved as if he was an untouchable king, particularly as he began to believe he would continue in office as the unelected "Metro Mayor" of a newly-combined regional government. Throughout his tenure, the defendant created and fostered a working environment for County employees and other elected officials that was marked by fear, intimidation, manipulation, and retribution.

The defendant consistently prioritized himself over the good of St. Louis County. Early in his administration, he told a senior staff member, "If you haven't figured it out yet, I'm only interested in doing the things that benefit me." This remark by the defendant seemed to summarize the experiences many of his staff had with him. If a decision could benefit Steve Stenger, he would be very interested in it. There is perhaps no better example than him leveraging taxpayer dollars to raise an unprecedented sum in contributions to his reelection campaign. The defendant treated any official decision that involved a campaign contributor as his most important policy priority but ignored everything else.

As a chief executive and leader, the defendant failed in dramatic fashion. His former staff members are left feeling betrayed, used, demoralized, and disillusioned.

---

*ADMINISTRATION BUILDING • 41 S. CENTRAL AVENUE • CLAYTON, MISSOURI 63105*
The County Government Center and the Council Chamber are accessible for persons with disabilities. If you need an accomodation or need this material in an alternative format, please call Genevieve Frank, Administrative Director, at (314) 615-5440 (voice) or call RelayMO 711 or 1-800-735-2966 (TTY). Fax Number: 314-615-7890

The work atmosphere the defendant embraced was more that of a fraternity house than an elected official's office. The defendant rarely appeared in his office, and would be absent for weeks at a time. He did not respect the dignity of his office. When he did come to work, he typically arrived late in the day wearing shorts, a t-shirt, and a baseball hat, and then he would immediately close the door and spend much of the day playing video games in his office before leaving early. He ignored offensive behavior. On at least three different occasions, each involving a different female employee, the defendant was present during instances of sexual harassment or learned of the instance shortly after the conduct occurred, but the defendant never took investigative or disciplinary action to rectify the situation. Literally laughing in the face of overt sexual harassment by campaign contributors and reporters, the defendant encouraged an atmosphere where victims were without a voice and felt that they could not go to the County Executive to report inappropriate behavior.

The defendant's criminal enterprise put dedicated public employees in difficult if not impossible positions. The defendant's scheme often required County employees to act unethically, and sometimes put them in positions with such limited information that they could not have known then that what they were being told to do was inappropriate. County employees were trapped, knowing that their refusal to comply would result in termination or forced resignation. The attendant loss of tenured, experienced, and professional expertise left a lasting imprint on County government that is significant and widespread.

Some of the roughly 4,000 County employees stood up against the defendant, and their courage and adherence to high ethical standards must be acknowledged. But many other employees were held hostage by a criminal, forced to choose between leaving for a less toxic work environment and remaining, accepting the stress and anxiety of hoping they would not be caught up in the defendant's corrupt behavior or unwittingly drawn into an illegal activity. Those who stayed as employees took home the stress, anxiety, depression, and anger, which can spread like an infective virus to friends and families, helping to create a hopelessness that St. Louis County would never move forward or address our real problems: racial inequities, economically devastated communities, lack of opportunity, and so many more.

The defendant thrived on division. He tried to divide the County Council, pitting one Council member against another. He tried to divide Democrats from Republicans, Democrats from other Democrats, and Republicans from other Republicans. He pitted nurses against police officers, unions against other unions, and everyday people against his campaign contributors. Sometimes it seemed Steve Stenger could not get along with anyone except his campaign donors. And he certainly got along well with them. In the end, other than with the defendant's campaign contributors, the defendant's leadership style made County government largely dysfunctional, unpredictable, and hamstrung.

The defendant's contentious relationships are legion, and they severely hampered our region's progress. The defendant's personal animosity for John Nations, the former leader of Bi-State Development Corporation ("Bi-State"), his petty jealousy of former Mayor Francis Slay, his contempt for his colleagues on the County Council, and his hatred for anyone he saw as crossing him led to stalled budgets, wasted taxpayer dollars, and thwarted opportunities for regional collaboration. For instance, Bi-State long had the opportunity to refinance its debt and use any savings to implement new Metrolink security strategies, but the defendant refused to approve the refinancing solely as a result of his personal pique with Bi-State's leader. The opportunity to refinance Bi-State's debt was but one of the countless opportunities that St. Louis County missed as a result of the defendant's behavior.

He often scoffed at the expectation that he perform the duties of his office, and he adamantly refused to lead on the important issues of the day. The defendant's sentencing hearing is scheduled to occur the week of August 9, the fifth anniversary of Michael Brown's death in Ferguson. Five years ago, the world's eyes focused on St. Louis County. Taking office shortly thereafter, the defendant faced a County needing real leadership, but he refused to engage genuinely with the African-American community and he chose simply to ignore the vexing challenges that faced County residents.

Similarly, the defendant's dismissal of decisions regarding the county's day-to-day management and operations left the County paralyzed to addressing ongoing challenges. His inattention to Animal Care and Control's operations left it in disarray. His failure to lead the Justice Center to implement new policies and practices left it in a chaotic state. His failure to address desperate budget issues, his disregard for his own budget director's advice, and his order that departments ignore the need for budget cuts left the County with an annual operating deficit of several million dollars. His refusal to engage with the community resulted in the federal government pushing the County toward demolishing public housing units in Wellston. The defendant's lack of attention, care, and compassion almost led to the displacement of hundreds of Wellston residents, many of which were children who could have been left homeless. In each instance, the defendant ignored an issue where he did not see a monetary benefit for himself or for his political campaign. His selfish priorities left these and many other important policy decisions unaddressed for years.

St. Louis County's new reputation for "pay-to-play" politics that emerged in the defendant's wake is already known and felt far and wide. High-performing County employees left public service. Highly-qualified candidates do not apply for jobs with the County. Well-respected civic leaders turn down opportunities to serve on important County boards and commissions. Each of these continue to occur every day in St. Louis County—these are just some of the results of St. Louis County's damaged brand.

The defendant's systemic "pay-to-play" scheme also severely compromised St. Louis County's brand as a place for economic development and investment. The defendant told potential developers and potential County vendors that they would "never get County business" if their proposal failed to benefit the defendant. The reputation for "pay-to-play" behavior has discouraged ethical developers from planning projects in the County and has discouraged ethical vendors from bidding on County contracts. We do not yet know the full extent of the financial damages, but we know that the financial toll and opportunity costs to the County over the coming years are significant and may be incalculable.

The defendant's conduct has taken its toll on so many good people of strong moral character and respectable reputations who—despite their best judgment—trusted the defendant, contributed to his campaigns, sought his help, lobbied him, or served as one of his staff members, advisors, contractors, or consultants. Many of those people knew nothing about the defendant's criminal conduct and would not have approved of it had they known. Nevertheless, they are left with the taint of being associated with Steve Stenger. Many are unable to find work, form partnerships, or attract clients. Some are connected to him in media reports despite their own innocence. The financial, psychological, and personal costs these individuals sustained are impossible to quantify; money cannot compensate for their losses. It may be impossible to restore the reputations of some innocent, well-intentioned people whose only desire was to engage in public service and were shocked to find themselves working for a criminal.

The County also sustained significant financial losses resulting from contracts and agreements negotiated and entered into at the defendant's behest. The loss of this capital will have long-term effects on the liquidity, viability, and economic health of the County. The defendant's unbridled control of the Economic Development Partnership and Port Authority, as described in the indictment, shows his misuse of public assets for personal and political gain. As a result, real estate owned by St. Louis County either was sold to Stenger campaign contributors inappropriately or remains unsold because potential buyers refused to "pay up." The defendant appointed individuals with histories of opposing minority-owned and woman-owned businesses participation in procuring contracts for County business. As a result of the defendant's misuse of development agencies, some leaders in the City of St. Louis have threatened to remove the City from the Economic Development Partnership.

The defendant's behavior also impacted the general public. Our constituents lost trust in County government, its elected officials, and in the democratic process as a whole. Taxpayers saw public funds spent to reward political supporters rather than serve the public good. The defendant's lasting impact on County government's reputation has rendered restoring trust in County government to be a generational challenge.

In the final analysis, the defendant never behaved as if he appreciated or even understood the significance of his office. He never grasped the true meaning of public service. He was not a public servant. He violated the public trust and his oath of office.

The defendant dug an enormous hole for St. Louis County. The undersigned are committed to working together in pulling our County out and moving forward with a positive vision for the future. But we write now to express our hope that the Court order a sentence that recognizes the immense negative impact Steve Stenger had on St. Louis County and orders restitution to compensate the people of St. Louis County for his crimes.

Sincerely,

Sam Page
County Executive

Ernest G. Trakas
Presiding Officer, County Council

Rochelle Walton Gray
District 4

Mark Harder
District 7

Lisa Clancy
District 5

Tim Fitch
District 3