# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION


UNITED STATES OF AMERICA,      )
                                 )
    Plaintiff,             )
                                 )
    v.                     )
                                 )
                                 )  No. 4:19-CR-416 RWS
                                 )
WILLIAM MILLER,            )
                                 )
    Defendant.            )

## SENTENCING HEARING

### BEFORE THE HONORABLE RODNEY W. SIPPEL
### UNITED STATES DISTRICT JUDGE


### SEPTEMBER 6, 2019



APPEARANCES:

For Plaintiff:        Hal Goldsmith, Esq.
                     OFFICE OF THE U.S. ATTORNEY
                     111 South 10th Street, 20th Floor
                     St. Louis, MO  63102

For Defendant:        Larry D. Hale, Esq.
                     HALE LAW FIRM
                     1221 Locust Street, Suite 310
                     St. Louis, MO  63103

Reported By:          SHANNON L. WHITE, RMR, CRR, CSR, CCR
                     Official Court Reporter
                     United States District Court
                     111 South Tenth Street, Third Floor
                     St. Louis, MO  63102
                     (314) 244-7966


PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

1  **(PROCEEDINGS STARTED AT 11:03 AM.)**

2  **(THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT AND WITH**

3  **THE DEFENDANT PRESENT:)**

4  THE COURT:  Good morning.  We're here this morning in

5  the case styled United States of America against William

6  Miller, Cause No. 4:19-CR-416.  Would counsel make their

7  appearances, please?

8  MR. GOLDSMITH:  Morning, Judge.  Hal Goldsmith along

9  with Special Agents Andy Ryder and Lindsey Wegge on behalf of

10  the United States.

11  MR. HALE:  Larry Hale on behalf of Bill Miller, Your

12  Honor.

13  THE COURT:  And Mr. Miller is present; is that

14  correct?

15  MR. HALE:  That's correct, Your Honor.

16  THE COURT:  Good morning, sir.

17  THE DEFENDANT:  Good morning.

18  THE COURT:  Counsel, have you and Mr. Miller had the

19  opportunity to read, review, and discuss the presentence

20  report in this matter?

21  MR. HALE:  We have, Your Honor.

22  THE COURT:  On behalf of Mr. Miller, are there any

23  objections to the factual statements in the presentence

24  report?

25  MR. HALE:  Judge, I've spoken to Mr. Wilke about some

minor additions.  He was kind enough to make those additions.
We fully accept the revised version, if you will, of the
presentence investigation report.

        THE COURT:  Any objections to the factual statements
in the presentence report on behalf of the United States
Attorney?

        MR. GOLDSMITH:  No, Judge.

        THE COURT:  There being no objections to the final
version of the presentence report, I adopt the factual
statements as the findings of fact in this proceeding.

        On behalf of Mr. Miller, are there any objections to
the probation officer's application of the sentencing
guidelines to those facts?

        MR. HALE:  Judge, not with regard to the calculation
based upon the plea agreement that we have.  Obviously, we are
seeking a downward variance, but otherwise, no, Your Honor.

        THE COURT:  Any objections to the probation officer's
application of the sentencing guidelines on behalf of the
United States Attorney?

        MR. GOLDSMITH:  No, Judge.

        THE COURT:  So, Mr. Miller, I know you've gone over
this with your counsel.  Based upon the application of the
guidelines and the facts of your case, you have a total
offense level of 14 and a criminal history category of 1.  The
guidelines recommend a period of incarceration of 15 to 21

1  months, supervised release of one to three years, fine range

2  of $7,500 to $75,000.  There is no restitution; correct?

3          MR. GOLDSMITH:  That is correct, Judge.

4          THE COURT:  And a special assessment due today in the

5  amount of $100.

6          Counsel, would you approach?

7  **(PURSUANT TO LOCAL RULE 13.05, A BENCH CONFERENCE WAS HELD ON**

8  **THE RECORD AND PLACED UNDER SEAL, AFTER WHICH THE FOLLOWING**

9              **PROCEEDINGS CONTINUED IN OPEN COURT:)**

10 Q   (BY THE COURT) And, Mr. Miller, there is a statute -- and

11 I'm sure you've gone over it with your attorney -- that lists

12 a number of factors I'm required to consider before I can

13 determine the appropriate sentence in your case.

14         With that being said, save for allocution and

15 discussion of those sentencing factors, does either attorney

16 know of any reason why we should not proceed to the imposition

17 of sentence?

18         MR. HALE:  I know of none, Your Honor.

19         MR. GOLDSMITH:  Not on behalf of the United States,

20 Judge.

21         THE COURT:  So, Mr. Miller, before sentence is

22 imposed, you have the opportunity to speak today.  You can

23 speak directly, you can ask your attorney to speak for you, or

24 you both may speak, however you see fit, but if there's

25 anything you would like to say, now is the time.

1    THE DEFENDANT:  Thank you, Your Honor.  Judge, I'm

2  before you today because I committed a crime.  I know I

3  committed a crime, and that's why I pled guilty.  I take full

4  responsibility for my actions.  I did the things that are

5  outlined in my plea.  I apologize to this Court, the Missouri

6  Bar, my family, and especially the citizens of St. Louis

7  County, and the St. Louis Economic Development Partnership

8  Board to whom I owed a fiduciary duty.

9    I let a lot of people down.  I know that and I regret

10  it.  I especially regret the pain I've caused my parents and

11  my wife and kids.  They don't deserve any of that pain.  My

12  parents taught me wrong from right.  They are honest, decent

13  people who possess immense integrity, and I let them down.  I

14  can only imagine what they think of me standing before you

15  right now.  And the same holds true for my wife.  I will live

16  with that for the rest of my life.

17    I've lost a lot of things that are important to me as

18  a result of my actions, things that I spent a lifetime

19  building, including my reputation, my integrity, and my

20  dignity.  I was a licensed attorney who worked hard to get

21  through law school, passed the bar, and distinguished myself

22  as an ethical attorney.  I've been disbarred as a result of my

23  actions.  It hurts.

24    Mr. Goldsmith argues that I should have walked away

25  and informed the FBI when Steve Stenger told me to tell Ms.

Sweeney that he wanted Mr. Bardgett to remain as the county's
lobbyist. He's right. Had I done so, I wouldn't be before
you today. I lacked the courage and the discipline to tell
Steve Stenger no. It's something that I think about every day
and probably will for the rest of my life.

I messed up, plain and simple, but I want you to know
that I'm a good person, a good person who did a stupid thing.
Mr. Goldsmith says I'm not a good person and I should go to
prison for my conduct and that my recorded words prove that
I'm not a good person. He's wrong in his assessment of my
character, but I said what I said in those recorded
conversations. I can't deny it, and I won't, but I hope this
Court recognizes that the words reflected in my information
and indictment aren't the only words I've said while employed
by Steve Stenger. I said other things, things before and
after the words reflected in the recorded statements, that
also reflect on my character. Those words aren't before this
Court.

In regard to my comments in connection with racial
equity, my words were harsh and should not have been said.
However, my comments were directed towards individuals and not
towards a race of people. Words matter, but so do actions,
and I ask this Court to also consider my actions in assessing
my character, especially as it relates to the issue of racial
equity, an issue that is very dear to me.

1    After months of interviews and a nationwide search, I

2  hired the first Chief of Diversity Officer for St. Louis

3  County, Jack Thomas, one of the most respected and esteemed

4  diversity professionals in the country.  I hired him in part

5  because I was impressed with his philosophy:  Real work for

6  real companies.  In a short amount of time, Jack has done

7  great things for the county's procurement process, and every

8  MWBE in St. Louis will benefit from his leadership.  I defy

9  anyone to challenge Jack's integrity or professionalism.  I

10  hired him because I knew he would make a difference, and he

11  has.

12    Second, I authorized the most ambitious,

13  far-reaching, and all-encompassing racial equity policy

14  initiative ever undertaken by St. Louis County government.

15  It's called Strength Through Equity, and its purpose is to

16  transform St. Louis County government so that it reflects full

17  participation and shared power with diverse racial, cultural,

18  and economic groups in every conversation that the county, the

19  county government, has going forward.  It represents a

20  sea change for equity for the county and hopefully for the

21  region.

22    I promoted the idea and fought with Steve to stay

23  with it after he said he didn't care about it anymore after

24  the election.  I pushed hard, and I got it done.  I put our

25  best staff members on this team and made sure they knew it was

our top priority.  It is my understanding the new
administration is still pursuing this policy initiative.  I
hope they do.  They should.  I hope it bears fruit.

So I ask that you consider these two things when
assessing my character in the area of racial equity.  My
actions should count for something.

Finally, Judge, there is one more thing I need to say
to correct the record before I am sentenced.  Mr. Goldsmith
argues my motivation for my conduct is that I was angling to
be the Chief of Staff of the new metro government.  That is
not true.  I never seriously considered taking that job, if
there was even ever going to be a job.  That was never a
motivation for anything I did in county government.

So, Judge, I ask that you sentence me for what I did
and not based on the false image of me offered by the
Government.  As reflected in the letters submitted on my
behalf, I'm a good man who served on the staff of Governor
Nixon and as an Administrative Law Judge, without blemish.  My
missteps occurred when I began working for Steve Stenger.

I ask that you take these things into consideration
and not send me to prison but rather allow me to try and
rebuild my life.  Thank you.

THE COURT:  Counsel?

MR. HALE:  Judge, thank you.  Before I get started,
Your Honor, I would just like to inform the Court that Mr.

1  Miller has here today with him his wife and a number of

2  members of his family, including, I believe, his

3  father-in-law, who I just had the pleasure of meeting this

4  morning.  They're here to support Mr. Miller in this difficult

5  time.

6          Judge, as you know, we have asked the Court to vary

7  downward from the total offense level of 14 to a total offense

8  level of 8.  That request, Your Honor, is based -- at least is

9  consistent certainly with what the probation office said in

10  paragraph No. 139 of the presentence investigation report in

11  which Mr. Wilke says that a downward variance may be warranted

12  because of the health issue facing Mr. Miller and also because

13  of his role in the offense.

14          Judge, the nature of the health issue is explained in

15  the presentence investigation report, but I note in the

16  Government's memorandum it's almost as if there was some

17  effort on the part of the Government to make light of his

18  condition, essentially saying that it's not uncommon for

19  individuals standing before a Court such as yourself to have

20  similar health-related issues.  And while, Judge, that is

21  true, this medically verified health condition is nonetheless

22  real, and it is nonetheless negatively impacting this man.

23          But more important than that, Judge, the fact that it

24  is a frequent occurrence doesn't mean that it is not important

25  in assessing whether or not this Court should place Mr. Miller

on probation, but I'm going to leave that alone because,
again, Judge, I believe that the PSR fully describes what
that's about.

Judge, Mr. Wilke also says that a downward variance
is warranted because of Mr. Miller's role in the offense.  I
would like to take some time, if I can, and talk about that,
that role in the offense.

Judge, I believe the PSR from -- I believe it's
paragraphs 15 to 71 -- paints a very detailed picture of the
overall scope of the offense, all of the relevant conduct
relating to this offense.  Judge, it talks about in October,
November of 2014, when Mr. Stenger was first elected, he
directed a gentleman in his office at that time, who's
identified in Mr. Miller's information, but he instructed a
Jeff Wagener to talk to the then-head of the Economic
Development Partnership and instruct him to give a contract to
JBA, the lobbying contract.  In other words, back in 2014 Mr.
Stenger instructed Jeff Wagener do exactly what Bill Miller
did.

But then it goes on, Judge, into 2014 and 2015, when
Mr. Stenger and Ms. Sweeney, Sheila Sweeney, and Jeff Wagener
and others put together a scheme with regard to John Rallo,
who is also charged in another case here, Judge, to get a --
initially an insurance contract to Mr. Rallo and then later a
consulting contract to Mr. Rallo, all of these things

1  occurring between 2014 and 2017.  Judge, and Jeff Wagener was

2  involved in all of it as well.

3        And that's all relevant conduct here, Judge.  And one

4  of the things that's interesting is, during that period of

5  time, nobody ever heard of Bill Miller.  He wasn't working

6  there then.  Bill Miller didn't start working there, Your

7  Honor, until December of 2017, and he worked there for a

8  period of 16 months, until April of 2019.

9        I might also, Judge, note from the PSR that, in

10  paragraph 69 of that document, Mr. Wilke also ranks in terms

11  of culpability the individuals who had been charged with

12  offenses associated with the Steve Stenger schemes:  Mr.

13  Stenger, Ms. Sweeney, Mr. Rallo.  And of those people, Your

14  Honor, Mr. Wilke identifies Bill Miller as the least culpable.

15  The least culpable.

16        Now, as the Court, I'm sure, is aware, Ms. Sweeney

17  received a sentence of probation from Judge Perry.  And

18  obviously, Judge, Ms. Sweeney's culpability was much greater

19  than that of Mr. Miller.  And we believe that on that basis

20  alone there is room here, Your Honor, to grant probation to

21  Mr. Miller so that, if nothing else, there is some level of

22  consistency and parity between the sentences imposed on

23  similarly situated other defendants.

24        And then something else I got to mention at this

25  juncture, Your Honor.  Also in paragraph 69 Mr. Wilke also

talks about, I believe, four people who are very much involved

in the criminality of Steve Stenger and Ms. Sweeney who have

never been charged. Who have never been charged. I think

those are important facts to go into a determination of the

appropriate sentence to impose here.

So, Judge, when we talk about this JBA lobbying

contract, what did Bill Miller do? Let's talk about what he

did. Let's talk about what he didn't do. I'd like to start,

if I can, with what he didn't do, Your Honor. Bill Miller did

not initiate this scheme. Your Honor, Bill Miller never

participated in any fundraising activities in connection with

Mr. Stenger. It was not Bill Miller who got together with

campaign donors and promised contracts, county contracts, in

exchange for campaign considerations. It was not Bill Miller

who made the decision to give those contracts out in exchange

for those considerations.

But probably of greatest importance in my mind, Your

Honor, is the fact that Bill Miller had no financial interest

in this scheme whatsoever. He wasn't going to make a dime.

And let's talk about what he did do. Steve Stenger

instructed Mr. Miller to -- and Mr. Miller and Jeff Wagener

and another gentleman identified in the presentence

investigation report to go and talk to Ms. Sweeney about

getting the JBA contract again to JBA -- I'm sorry -- getting

the lobbying contract again to JBA. And they did what their

1   boss told them to do.

2          The three of them went, met with Ms. Sweeney, told

3   Ms. Sweeney what Steve Stenger wanted her to do with that

4   lobbying contract.  And then Jeff Wagener and Bill Miller,

5   members of the Board of the Economic Development

6   Partnership -- and they did vote to approve the selection of

7   JBA.

8          And then there were some text messages exchanged

9   between the principal at JBA and Mr. Stenger -- I'm sorry --

10  Mr. Miller, explaining essentially that the contract was about

11  to be awarded to JBA.  And that was it.  That's what he did in

12  connection with this particular scheme.

13         Judge, I believe when we look at the actions of Bill

14  Miller with all of the relevant conduct in mind, I believe

15  it's clear that, when all the factors are considered, when all

16  of the relevant conduct is considered, Your Honor, Mr. Miller

17  was a minimal participant.  And that's consistent with what

18  the probation office determined.

19         Now, I'm not here to tell you, Judge, that Mr. Miller

20  didn't commit a crime.  I'm not saying that.  And I hope the

21  Court does not interpret in any way that I'm saying he's not

22  criminally responsible.  We know he is.  What I am saying,

23  Judge, is that I think it's important that the Court

24  understand the circumstances surrounding the commission of the

25  crime.

1    Judge, in our sentencing memo I quote Mr. Goldsmith

2    here at the sentencing of Steve Stenger in which Mr. Goldsmith

3    described in connection with the sentencing of Steve Stenger

4    what I've been calling a toxic environment for employees in

5    St. Louis County.  He talked, Your Honor, about the fact that

6    it was known, it was understood, that if you don't do what

7    Steve Stenger tells you to do, you're gone.  You're out.  Not

8    my words.  The U.S. Attorney's words, Judge.  And he talked

9    about the fact that Stenger used that intimidation, the

10   vindictiveness against his top executive people.  Mr.

11   Goldsmith's words.

12   But, Judge, today, and in the Government's sentencing

13   memo, all of a sudden Bill Miller, who obviously was included

14   as a victim, if you will, in this toxic environment that Mr.

15   Goldsmith described in connection with Mr. Stenger, now on

16   Friday, when it's Bill Miller's turn to be sentenced, no, Bill

17   Miller was a -- he was a right-hand man.  He was this.  He was

18   that.

19   But, Judge, the problem is you can't have it both

20   ways.  If Mr. Miller was subject to Steve Stenger's abuse in

21   connection with Steve Stenger's sentence, then the same thing

22   holds true here with regard to Mr. Miller.

23   But, Judge, a description of that environment doesn't

24   just stop with what Mr. Goldsmith said.  Mr. Goldsmith

25   attached four exhibits to a sentencing memo, one of which was

1   from the St. Louis County Council.  And it was issued -- that

2   was a letter issued in connection with Steve Stenger's

3   sentence.  The other three, from three other St. Louis County

4   agencies, were directed at Sheila Sweeney and Steve Stenger.

5   And certainly the St. Louis County document describes also a

6   toxic environment.

7          I'd like to address briefly some of the words from

8   the County Council, Judge.  But I also say that Bill Miller

9   was as much subject to that kind of conduct from Mr. Stenger

10  as was anybody else.

11         The St. Louis County Council says the Defendant Mr.

12  Stenger's criminal enterprise put dedicated public employees

13  in difficult, if not impossible, positions; the defendant's

14  scheme often required county employees to act unethically and

15  sometimes put them in positions with such limited information

16  that they could not have known then or what they were being

17  told to do was inappropriate; county employees were trapped,

18  and it goes on from there.

19         Bill Miller was subject to the same kind of

20  environment, Your Honor -- again not to deny his criminal

21  responsibility but just explain to the Court essentially what

22  the motivation was.

23         Judge, we've got factors here under 3553(a).  I just

24  want to touch briefly upon some of those.  I'm not going to go

25  into detail because I think I've addressed a lot of them

1   already.

2          First of all, Your Honor, I know you've received

3   letters from members of Mr. Miller's family.  You've received

4   letters from former employers.  You've received letters from

5   people who know him, friends and people who have associated

6   with him in the community, to attest to his good character.

7          But something else, Judge.  I want to go back to

8   those letters from St. Louis County again, the County Council

9   and the three agents.  And I think those letters are

10  particularly telling, Your Honor, because the County Council

11  and those members of those agencies were people who worked

12  with Bill Miller every day.  And they knew him.  They knew

13  him.  They worked with him all the time.  And, Your Honor, not

14  a word about Bill Miller is mentioned in that in any of those

15  letters at all.  There is nothing negative in those letters

16  about Bill Miller because they knew him to be the good man

17  that he just represented himself to be here.

18         Also, Judge, with regard to 3553(a), I also want to

19  mention again that -- we mentioned that there is an

20  alternative to the probation we ask for in our analysis under

21  3553(a).  The alternative would be probation with a component

22  of house arrest or community confinement.  I'm not asking for

23  that, Judge, because I don't believe the circumstances and the

24  facts here warrant it, but, nonetheless, that is something

25  that I did want to make sense of.

1    Judge, I'd like to talk just briefly, if I might,

2  about some of the things the Government has represented in its

3  sentencing memo.  In particular, the Government says -- they

4  cite the fact that Mr. Miller had been offered a position by

5  Steve Stenger with this merged city-county government.  And

6  the Government seems to imply that that somehow motivated Bill

7  Miller to do what he did here.  Now, I'd like to look briefly

8  at that, Judge, because I think, when we do, we recognize the

9  ridiculous nature of that theory.

10    So if I got this right, Steve Stenger gets hundreds

11  of thousands of dollars in campaign contributions, gets a

12  $149,000 contract for lobbying work, and Bill Miller gets a

13  promise of a job in a nonexistent merged city-county

14  government.  Not only does it not exist, I think a lot of

15  people in this community understood that it did not exist; it

16  would never exist.  What a deal for Bill Miller.  Your Honor,

17  I would submit to you that that is ridiculous.

18    But let me tell you what's not ridiculous, because

19  this is a courtroom.  This man doesn't work in a courtroom,

20  but the truth does.  The truth is that if Bill Miller, when

21  instructed by Steve Stenger to go talk to Ms. Sweeney and tell

22  Ms. Sweeney what he wanted done with that contract, Bill

23  Miller would have been gone from his job in St. Louis County

24  with a quickness.  Now, did he make a mistake in not saying

25  no?  Of course he did, Your Honor.  But I think as far as the

motivation is concerned, it's quite clear that Bill Miller, like all of the other county employees identified not only by the Government itself but also by St. Louis County Council, wanted to keep their jobs.

Judge, the Government says that Bill Miller was the right-hand man of Steve Stenger. Now, that's interesting. Now, he certainly was Steve Stenger's Chief of Staff, and as Chief of Staff, yeah, to that extent, he was Mr. Stenger's right-hand man. No doubt about it.

But, Judge, when you start talking about, as the Government does, Mr. Miller being Steve Stenger's right-hand man with regard to these schemes, let's go back to the relevant facts here. The relevant facts, Your Honor, identify one person who was consistently involved in all of those schemes: Jeff Wagener. He was involved in the January -- I mean the November 2014 JBA contract. He was involved in both Rallo contracts. Of course, Ms. Sweeney was as well. But Jeff Wagener was always there.

In fact, Judge, in 2018, when Bill Miller goes to see Ms. Sweeney at the direction of Steve Stenger, Jeff Wagener is right there. You want to talk about a right-hand man, Judge, I don't think you can get any closer to a right-hand man in connection with Steve Stenger's schemes than Jeff Wagener. But Jeff Wagener has not been charged with a crime and won't be. Will not be. I'll address that in just a moment, Judge.

1    There are two other issues I want to touch upon

2    rather quickly here.  The Government has offered a recording

3    of a comment Bill Miller made in connection with MOKAN

4    contractors, and I'm assuming they did that, Judge, so that

5    they can try to paint Mr. Miller as a racist.  And that's

6    interesting, Judge.  So if I got this right, Bill Miller, this

7    white racist, hires an African-American lawyer to represent

8    him in the darkest legal matter he's ever faced.  That's very

9    interesting.

10   Now, fortunately, Judge, insensitive, inappropriate

11   comments are not a crime.  And Lord knows if they started

12   locking up everybody who made insensitive, inappropriate

13   comments, a lot of us would be in jail, because all of us have

14   weak moments at times.  But they do not reflect the belief

15   about this man.  He may have had a problem with the people he

16   identified, but he does not have a problem with a race of

17   people.

18   Judge, additionally, there is this business about the

19   Northland mall deal that's included in the Government's

20   sentencing memo.  Judge, Steve Stenger -- no.  Bill Miller

21   went to Steve Stenger's house to talk to Steve Stenger about

22   county business because during this period in 2014, as the

23   Government has acknowledged, Steve Stenger abdicated his

24   complete responsibility for county government.  Gave it up.

25   Half the time he didn't come to the office.  The other time he

went in his office he played video games.  That's what the
Government says.  And that's true.

       But then the question becomes who was running county
government when Bill Miller had -- I mean when Steve Stenger
had abdicated his responsibility?  It was Bill Miller.  So on
this particular day, Bill Miller goes to Stenger's house to
talk to him about county business, and Stenger yells at him,
like he always did.  But then he goes on and he talks to Bill
Miller about the fact that he and the developer are talking
about a -- planning to offer a job to the father of the county
council member in exchange for her support.  That didn't come
from Bill Miller.  That came from Steve Stenger.

       Now, what Bill Miller did was he said, "You want me
to make some calls?"  And that was dumb, but that's what he
did.  But that's all he did.  He never made any calls.
Stenger told him no, and that was it.  That was the extent of
it, Your Honor.

       Judge, the Government in its memo exhibits great
outrage when they talk about Bill Miller and what he did, but
I've got a problem with that outrage, Judge.  Let me tell you
what it is.  Where is the outrage in connection with all of
the things that Jeff Wagener did?  He was involved in this
thing going back to 2014 all the way through 2018.  Where is
the outrage there, Your Honor?  Where is the concern for what
the citizens lost in connection with what Jeff Wagener did?

1    They have never charged him, and they won't charge him.

2            The other fellow that went with Mr. Wagener and Bill

3    Miller to talk to Ms. Sweeney in 2018 has never been charged

4    and won't be charged.  Again, the four people identified in

5    the PSR who have not been charged, who did a number of things

6    in connection with Steve Stenger's schemes, have not been

7    charged, and some of them may never be charged.

8            In closing, Judge, Mr. Miller -- he has lost a lot.

9    He mentioned his law license, no doubt.  He lost a job he had.

10   He's now working, but he's making a fraction of what he was

11   making before.  He lost his reputation.  He's been publicly

12   embarrassed, and probably -- from talking to Bill Miller, I

13   can tell you, Judge, that probably one of the greatest things

14   that has hurt him is the harm and embarrassment it has done to

15   his family.

16           But, Judge, I noted something about the Government's

17   memo.  They mention little, if anything, about the presentence

18   investigation report.  And I know why:  Because it doesn't

19   help them try to send this man to prison.

20           And, fortunately, Mr. Wilke did a great job.  What we

21   have here, Judge, is an identification of Bill Miller as the

22   least culpable.  Send this man home, sir, please, because he

23   does not deserve to go to prison.  Your Honor, send Bill

24   Miller from this place so that he can get back to his family

25   and so that he can begin the process of trying to build his

1  life, because he does not deserve to go to prison.

2          I thank you for your attention, sir.

3          THE COURT:  Thank you.

4          Anything on behalf of the United States Attorney?

5          MR. GOLDSMITH:  Yes, Judge.  Thank you.

6          Judge, I want to briefly address a few comments that

7  Mr. Hale made.  And, of course, we do believe that the truth

8  should be heard in this courtroom.  And regarding the

9  recordings, I think we would all agree that there's no truer

10 way to understand what an individual intends, what is in a

11 person's mind, and what is in a person's heart than when we

12 hear recordings of that individual engaged in the criminal

13 scheme when he doesn't know he's being recorded.

14         And that's the significance of the recorded -- the

15 clips and such, the transcripts that were included in the

16 Government's sentencing memo, Judge, because not only is the

17 offense conduct important here, but the history and

18 characteristics of this defendant are.  And there's no better

19 way to understand the character and characteristics of this

20 defendant than in what his own words show us.

21         I would also comment on the suggestion that this

22 defendant should be compared to related-defendant Sheila

23 Sweeney.  As I pointed out to the Court, Sheila Sweeney's

24 conduct relative to the Government's investigation was

25 significantly different than this defendant.  That conduct was

well known to Judge Perry when she entered her sentence in that case.

The Government's more than happy to provide more information to the Court should the Court need that, but I believe the Court understands that situation. And we're talking apples and oranges. This Court cannot compare, as the defendant suggests, his situation with the related defendant, Sheila Sweeney.

And the last comment I would make is to what Mr. Hale said concerning those organizations knowing this defendant. Yes, they well knew this defendant, and we've put in the sentencing memo a direct quote from one of the individuals at the St. Louis County Economic Development Partnership who told the FBI that the threats were never this bad when Jeff Wagener was the Chief of Staff. They went up incredibly once this defendant became the Chief of Staff.

And as long as we're talking about that, Mr. Hale would suggest Jeff Wagener was Defendant Stenger's -- really Defendant Stenger's right-hand man. He was fired. He was demoted. In December of 2018, Jeff Wagener wasn't doing the business and bidding of Steve Stenger, and he replaced him with this defendant, Bill Miller, because the Defendant Stenger knew that Bill Miller would carry out his orders, his directives, and help him and participate in and aid and abet him in that pay-to-play scheme, which was so very important

1  during the year 2018 when the Defendant Stenger faced a

2  preliminary -- a primary election as well as a general

3  election.  So those were my comments concerning what Mr. Hale

4  has addressed.

5      I want to turn back to this defendant, Bill Miller,

6  if we can, Judge, and I want to first speak about a chain of

7  events which occurred during December of 2018.  And the Court

8  well knows that was in the direct midst of the illegal

9  pay-to-play scheme because those chain of events, that chain

10  of events, helps us understand and puts into context this

11  defendant's significant role in that illegal pay-to-play

12  scheme and his significant role as former County Executive

13  Stenger's, yes, right-hand man.

14      On Tuesday, December 11, 2018, St. Louis County

15  Council was considering its preliminary budget for the year

16  2019.  Difficult debate.  They ultimately passed that

17  preliminary budget, and it included some department -- some

18  cuts to some department budgets.  The vote in that by the

19  council was 5 to 1 in favor of those budget cuts.

20      Following that council meeting, that very same

21  evening, December 11 of 2018, this defendant, Bill Miller, not

22  Steven Stenger, this defendant, Bill Miller, over his own name

23  and his own title, County Executive's Chief of Staff, issued a

24  public statement, a public statement.  And in that public

25  statement, Judge, this defendant stated that the council's

1    self-serving budget actions represent a betrayal of public

2    trust.  Right?  We're in the midst of the pay-to-play scheme

3    which this defendant is fully involved in.

4              This defendant also stated publicly that night, in

5    disparaging the County Council, that the Council has also

6    willfully violated the law in refusing to provide even the

7    minimum mandated funding amount to the St. Louis Economic

8    Development Partnership.  They have betrayed the public trust,

9    and they violated the law.

10             But what happens the very next day, Wednesday,

11   December 12 of 2018?  This defendant took the final steps in

12   that pay-to-play scheme involving a state lobbying contract

13   when, as the appointed board member of the St. Louis Economic

14   Development Partnership, he voted to award that state lobbying

15   contract to one of County Executive's significant political

16   donors, well knowing that the contract was in exchange for

17   those political donations, the very crime to which he has now

18   pled guilty.

19             So while publicly accusing the County Council of

20   criminal acts and a betraying of public trust, this defendant

21   was himself committing actual illegal acts, violating his

22   fiduciary obligations to the Economic Development Partnership

23   as a board member, and abusing his position of trust to the

24   citizens of St. Louis County.

25             And, Judge, in this case there is absolutely no

question that this defendant knew that his participation in
that pay-to-play scheme was wrong.  We have his own words that
reflect his intent and what was in his mind.

During October of 2018, in discussing a scheme to
bribe a public official in order to gain her support for a
redevelopment plan put forward by Stenger's political donors,
this defendant stated, quote, "What do we care?  We're not
doing it.  Steve can show a win if it goes through.  Do I
think it's right?  Of course it's not right.  What do we F-ing
care?  And if it gets Jane Doe a little closer to us, who
cares?  Look, until the end of the year, we need friends."

This defendant was all in in this scheme.  And,
again, Judge, that's as ugly a statement by a public official
as there is.  But, again, in the context here, it clearly
shows this defendant's knowing involvement and intent.

The defendant claims in the sentencing memorandum
that he never engaged in communication with campaign donors
promising county contracts in exchange for campaign donations.
That's at page 3 of their sentencing memo.  But that's more
than disingenuous here, Judge, and extremely misleading
because we know, of course, that he did communicate with
political donors regarding Economic Development Partnership
contracts.

As only one example, we included in our sentencing
memo evidence that this defendant was in direct contact with

the political donor who obtained that state lobbying contract

from the Economic Development Partnership through this

defendant's efforts, keeping that donor apprised of the bid

process and advising that donor when he and the other board

members when this defendant and the other board members had

approved the contract.

We also know -- and Mr. Hale alluded to this --

again, as we set forth in our sentencing memo, that this

defendant offered to get directly involved in helping the

political donor who was attempting the redevelopment project

through the scheme to bribe that public official, but Stenger

told this defendant "thanks but no thanks," and Stenger

handled that deal himself.

But what's significant there, Judge -- and it goes to

this defendant's history and characteristics and the offense

conduct -- is that he offered, not that it was accepted and

that he actually did it, he offered. He offered to do that to

get right smack dab in the middle of that bribery scheme and

make it work.

And this is the quote. "And I told Steve 'Do you

want me to call the project developer to take care of this?'

This was weeks ago. No. No. Okay. Then F-ing don't have

the project developer call us. You know? I mean, it's like,

F."

It's a significant thing, Judge, that he offered.

1    And that's what this is about, history and characteristics.

2            Defendant makes the strikingly inconsistent argument

3    that, on the one hand, he did not gain financially from his

4    criminal conduct, and yet, on the other hand, he says he only

5    went along with the criminal scheme because he was afraid of

6    losing his job, a job which paid this defendant $130,000.  So,

7    of course, just based on those facts, this defendant benefited

8    financially from his continued participation in the scheme by

9    receiving that county salary of $130,000.

10           Regarding the defendant's attempted use of the "just

11   following orders" defense here, this defendant was not a

12   low-level employee simply following orders.  He was, for all

13   intents and purposes, the number two authority in St. Louis

14   County government.  He was a lawyer.  He was a former judge.

15   He was the former governor's legal counsel.  He had the County

16   Executive's ear when it came to running county government,

17   including the firing of employees, as we saw his threats to

18   fire legal counsel for the Economic Development Partnership

19   and in his discussions regarding firing the CEO of the

20   Economic Development Partnership, Sheila Sweeney.

21           And such an argument that he was just following

22   orders is totally inconsistent with the fact that he lied to

23   the FBI special agents when they first approached him during

24   March of 2019 simply in order to gain his cooperation and his

25   assistance in understanding the pay-to-play scheme.  But this

defendant lied, and he made false statements to those FBI

agents for one reason:  In order to conceal the pay-to-play

scheme and his active participation in it.  The "just follow

orders" defense shouldn't work today for this defendant under

these facts and circumstances.

          And, Judge, I think we'd all agree that every scheme

and conspiracy has a leader -- and, yes, there is no question

Steve Stenger was the leader here -- but this defendant, under

all the facts and evidence, worked awfully hard to make sure

that the illegal scheme succeeded.  He outright boasted about

it, Judge.

          For example, when discussing how to convince Sheila

Sweeney to recommend the state lobbying contract go to that

political donor, quote, "If it was just me and her in some

dark room somewhere, I might make it a little bit more

forceful," closed quote.

          And this defendant's lesser role in the scheme, as

Mr. Hale keeps arguing, has already been accounted for here.

Stenger had a much higher guideline of 37 to 46 months.  This

defendant deserves no more benefit or leniency in that regard

than he has already received from the guidelines and the

evidence and the facts and circumstances in this case.

          And we cannot forget, Judge, that there are real

victims in this case, the citizens of St. Louis County who had

their trust in government broken, the companies and

1    individuals who submitted bids in competition with the

2    political donors and who thought they were on a level playing

3    field in the bidding process, but, of course, they weren't

4    even in the game, including a company that bid against the

5    political donor who received that state lobbying contract.

6          And we can't forget the other organizations like the

7    Economic Development Partnership and the County Port Authority

8    whose funds were improperly used like a piggy bank in the

9    pay-to-play scheme.

10          Judge, based upon the 3553(a) factors here and all of

11   the evidence before this Court, it is the Government's

12   position that this defendant should be sentenced within the

13   advisory guideline range of 15 to 21 months in prison.  Thank

14   you.

15          MR. HALE:  Judge, if I might?

16          THE COURT:  You may.

17          MR. HALE:  I stood here and I listened to what he had

18   to say, particularly about Jeff Wagener.  First of all, he

19   said Jeff was fired.  No, sir.  The presentence investigation

20   report --

21          THE COURT:  He said he was demoted.

22          MR. HALE:  He was demoted.  Yes.  He was.  But,

23   Judge, he was there in November of 2018.  But I didn't hear

24   one word from the Government to explain its outrage about what

25   Jeff Wagener did, because they can't, they haven't, and they

won't.

Judge, something else that's incredible to me, the Government says that Bill Miller risked his $130,000 salary. I think that's consistent with what I'm saying, Judge. If he risked his $130,000 salary in refusing to do what Steve Stenger told him to do, then he loses his job. That's what we're saying here, Judge.

They talk about Sheila Sweeney. Judge, Sheila Sweeney was involved in all of those schemes. They want to talk about comparing Bill Miller to Steve Stenger? Bill Miller never initiated any of these things. For most of them he wasn't even there.

Your Honor, again, we ask that you send this man home, because these facts and this evidence does not support a sentence of incarceration. Thank you, sir.

THE COURT: Anything further?

MR. GOLDSMITH: No, Judge. Thank you.

THE COURT: Well, I'll take the first legal point. Although we kind of touched on it, nobody really focused on it. There is a motion for a departure under the guidelines under Chapter 5 as a minimal participant.

MR. HALE: Right.

THE COURT: And to qualify for minimal participant under 3B1.2, the commentary talks about that this guideline is intended to cover defendants who are plainly among the least

culpable to those involved in the conduct of a group.  Under

this provision, the defendant's lack of knowledge or

understanding of the scope and structure of the enterprise and

of the activities of others is indicative of the role of a

minimal participant.

MR. HALE:  Yes, sir.

THE COURT:  I can't reach that conclusion here that

he didn't understand the nature and scope of the activity of

the County Executive.  This is typically someone who's asked

to do a discrete task and doesn't really understand how it

fits into the bigger picture.

The presentence report lays out that Mr. Miller

clearly understood the quid pro quo nature of what he was

doing.  He wasn't just delivering a message he didn't

comprehend.  He was delivering a message for which he clearly

comprehended its purpose and import.  So I deny the motion

under Chapter 5 for a downward departure such that the

guidelines are properly calculated.

Mr. Goldsmith, you're looking at me like I'm --

MR. GOLDSMITH:  Judge, I took it as a motion -- I

didn't take it as a motion for departure.  I took it as a

motion for a variance, and that's why I didn't respond.

THE COURT:  Okay.  Well, it's docketed as a motion

for departure.

MR. HALE:  Correct.

1    THE COURT:  So if you end up at the United States

2    Court of Appeals in another day with three other judges --

3    MR. GOLDSMITH:  No.  You've made the ruling.  I

4    appreciate it.

5    THE COURT:  I just wanted to make sure that there was

6    no confusion.  Like whatever we do today, we know why we did

7    it and how we got there.  And it's just I need to address that

8    first as a legal issue.

9    MR. HALE:  Okay.

10   THE COURT:  I do find that the guidelines are

11   properly calculated as set forth as to what we reviewed

12   earlier with Mr. Miller.

13       I have a lot of notes from things that were said.

14   Mr. Miller, I have no doubt you're a good person.  One of the

15   difficult things about this job -- and that's not the problem

16   today, to worry about what I do -- is that I see a lot of good

17   people who make bad choices.  And so whatever happens today,

18   this is not about you as a person.  You have a future.  What

19   you do with that future, of course, is up to you.  And the

20   quality of your character will tell us what happens next.  So

21   good people do end up in court, but it's because they made a

22   bad choice.  And that's what's so difficult about today.  And

23   Mr. Hale's very eloquent and very thoughtful.

24       It's difficult because a person of your caliber, of

25   your education, of your opportunity, fell prey to abuse, for

1    whatever reason how we got here, to abusing the public trust

2    in the county government.  That's one of those things, when

3    the statute talks about the personal characteristics of the

4    defendant, that is so difficult.  A person with so much

5    opportunity made a choice, however it happened, and often it's

6    incrementally the next thing you know, you're on the wrong

7    side of the line.  You didn't get up one day and say, hey, I

8    want to do this, but over time you let other influences

9    overwhelm your better judgment, it's clear, to put you in

10   circumstances in the situation that's clearly criminal, and

11   trading the treasure of the public and its actual treasure in

12   exchange for power.

13        I mean, Mr. Goldsmith didn't quote the one very

14   damning quote about this is the exercise in power.  Power for

15   its own sake never gets anyone anywhere.  It's a very endless

16   destination.  And it's difficult.  So that's why this is hard.

17   There are a lot of redeeming qualities, but they also are

18   difficult to reconcile with the conduct, given the access,

19   opportunity, education, and ability that you have.

20        The statute talks about the nature and circumstances

21   of the offense as a factor.  Public corruption, the nature and

22   circumstances of the offense.  Unfortunately, this was not an

23   aberrant moment:  In one afternoon I made a bad choice, but I

24   went back and I fixed it, or I never engaged in it again.  It

25   did take place over a period of time.

1       The seriousness of the offense.  I haven't read the

2   transcripts of what Judge Perry said to Mr. Stenger or to Ms.

3   Sweeney.  But the public trust, to undermine that public

4   trust.  People go to work every day believing that the people

5   in this building and all the other government agencies have

6   their best interest at heart so they can go about the business

7   of their lives, and it's a tragedy when that trust is

8   betrayed, because that fabric of our society is important, and

9   undermining that trust hurts us all for a long period of time.

10      To promote respect for the law.  That's fundamental.

11  To provide just punishment.  That's just a piece.  Sentencing

12  isn't just about punishment.  It's about all these other

13  things.  To afford deterrence.  That's a compelling issue

14  today, deterrence.  What's deterrence?  What will make the

15  next person stop and think real hard about the choices that

16  they're making?

17      Protect the public from future crimes.  I don't think

18  you're going to be back in a room like this again.  I know

19  however hard it was to learn this lesson, it's a lesson well

20  learned, and you're not coming back.  You knew better before

21  as an attorney and as a judge and in the highest levels of

22  state government, but somewhere, somehow, Mr. Stenger and

23  others turned all those good intentions in the wrong

24  direction.

25      Unwarranted sentencing disparities.  Mr. Goldsmith is

1  right. Ms. Sweeney is situated differently than you are.

2  It's not my job to decide who should be and who shouldn't be

3  indicted. Mr. Stenger had a longer sentencing range and

4  significant restitution.

5       The other thing that's difficult is, I'd say, if not

6  the majority, certainly the plurality of people that stand

7  there have some sort of mental health issue. It's a tragedy

8  of this room that we confront that in different ways, and that

9  might be a contributing factor to the conduct that brings

10  people to the courthouse, and I don't find that that is a

11  significantly distinguishing factor.

12       So I'm not going to belabor it. I've thought about

13  all of those issues, and as I said before, deterrence is a

14  compelling issue to me and the community's understanding of

15  what's acceptable and not acceptable when you reach the

16  highest level of government, and I do find that a sentence of

17  15 months satisfies the statutory purposes of sentencing,

18  followed by a three-year term of supervised release.

19       As a result, sentence will be imposed as follows:

20  Pursuant to the Sentencing Reform Act of 1984 and the

21  provisions of 18, United States Code, 3553(a), William Miller

22  is hereby placed in the custody of the Bureau of Prisons for a

23  term of 15 months followed by a term of supervision of three

24  years.

25       I'm not going to impose a fine because, I think,

1    under the totality of the circumstances, given the family

2    obligations and the fact that you won't be employed for a

3    period of time, I don't think a fine is appropriate.

4         While on supervision -- well, you are to report in

5    person to the probation office in the district to which you

6    are released within 72 hours of your release, for three years

7    of supervised release.  While on supervision, you are to

8    comply with the standard and mandatory conditions adopted by

9    this Court, with the following additional conditions:

10        You are to participate in a mental health evaluation

11   and follow any mental health treatment as prescribed and

12   follow the rules and regulations of that treatment until

13   released.

14        You are to submit your person, property, house,

15   residence, vehicle, papers, computers as defined by the

16   statute, other electronic communications or data storage

17   devices or media, or office, to a search conducted by the

18   probation office, at a reasonable time, in a reasonable

19   manner, based upon any reasonable suspicion of contraband or

20   evidence of a violation of a condition of your release.  You

21   are to warn anyone else who resides with you that they are

22   subject to that search condition as well.

23        It is further ordered you are to pay to the United

24   States a special assessment of $100, which is due today.

25        Are there any objections to the Court's findings of

fact, conclusions of law, the manner in which the sentence was pronounced, or the manner in which the hearing was conducted?

MR. HALE:  I have none, Your Honor.

MR. GOLDSMITH:  Not from the United States.

THE COURT:  Sentence will be imposed as stated.

If you want to appeal, you need to do so within 14 days.

MR. HALE:  Judge, we --

THE COURT:  Mr. Hale will file a notice for you if you ask him to do so.  If you can't get that done, you can ask the clerk.  If you can't afford the filing fee, it is possible, upon a proper motion, the fee would be waived.

MR. HALE:  Judge, we would request voluntary surrender, and my understanding is the Government does not oppose that request.

MR. GOLDSMITH:  We have no objection.

THE COURT:  So you are to surrender yourself to the Bureau of Prisons facility designated to you by the U.S. Marshal Service.  That does mean what it says.  It might be close.  It might be South Dakota or Pennsylvania for some reason.

If, for some reason, you can't get there, get in touch with Mr. Hale and arrange to surrender to the Marshal Service locally.

Any other matters for the Court's consideration?

1           MR. HALE:  I have nothing, Your Honor.

2           MR. GOLDSMITH:  Not from the Government, Judge.

3           THE COURT:  Good luck to you, sir.

4               **(PROCEEDINGS CONCLUDED AT 12:05 PM.)**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

I, Shannon L. White, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 40 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 7th day of October, 2019.


/s/Shannon L White
/s/Shannon L. White
Shannon L. White, CRR, RMR, CCR, CSR
Official Court Reporter